### GUARANTEE BOND & MORTGAGE CO. et al. v. HILDING.

(Circuit Court of Appeals, Sixth Circuit. June 6, 1923.)

No. 3715.

1. Bankruptcy ☞140(3)—Property held by bankrupt as trustee held not assets of his estate.

Automobiles bought while bankrupt was conducting a business as trustee under a trust mortgage executed by the owner for the benefit of creditors, with borrowed money for which bills of sale of the cars were executed in the name of such business, *held* not to pass to his trustee as a part of bankrupt's estate, nor subject to administration by the bankruptcy court.

2. Bankruptcy ☞151—Trustee's rights in property no greater than bankrupt's.

A trustee succeeds to no higher rights in the bankrupt's estate than the bankrupt possessed, except in so far as the statute authorizes him as such trustee to recover property transferred or assigned in fraud of creditors.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suit in equity by Charles V. Hilding, trustee in bankruptcy of Fred W. French, against the Guarantee Bond & Mortgage Company and others. Decree for complainant, and defendants appeal. Reversed and remanded.

Prior to December 19, 1919, Claude B. Tompkins was conducting an automobile and garage business in the city of Grand Rapids, Mich., under the name of the Hermitage Garage & Auto Company. Tompkins, on the date above mentioned, being largely indebted to a number of creditors, executed a trust mortgage for the benefit of his creditors to Walter H. Brooks, trustee, covering all his personal property, used in his business, including accounts and bills receivable. Brooks took possession of this property as such trustee, and conducted the business until August 9, 1920, at which time, by reason of ill health, he assigned this trust mortgage to Fred W. French, who took possession of the property and business and continued in control and operation thereof until November 27, 1920.

Upon succeeding to this trust, French caused an inventory and appraisement to be made of the assets then on hand, which amounted in the aggregate to $44,124.21. This included the leasehold of Tompkins in the real estate in which the business was conducted, under a lease granting to him the option to purchase the same at a price named therein, which leasehold and option to purchase was appraised at $17,130. After the execution of the trust mortgage, Tompkins conducted a rather extensive business in the sale of King and Liberty automobiles, particularly the King, as a personal enterprise, separate and apart from the garage business conducted by Brooks, trustee, but in the same building. In April, 1920, Walter J. Nelson, Fred W. French, and Claude B. Tompkins undertook to organize a corporation for the purpose of taking over all of the business and property of Tompkins. This arrangement contemplated the sale of a limited portion of this stock to outside parties and an equal division of the residue among the three promoters.

In furtherance of this plan and purpose Nelson and French indorsed the paper given by Tompkins, in the name of the Hermitage Garage & Auto Company to the Commercial Savings Bank. They also borrowed from the Fourth National Bank of Grand Rapids $7,100, either for the purpose of paying other claims secured by the trust mortgage or purchasing them at 50 cents on the dollar. The note evidencing this loan was signed by French and Nelson; $2,100 of this indebtedness was paid and a new note executed for the balance of $5,000. This $7,100, with an additional amount of about $300 contributed by French, was deposited in the bank to the credit of Chas. M. Owen, an attorney, who expended the same in the purchase of claims against the Hermitage Garage & Auto Company at 50 cents on the dollar, and these claims, amounting in the aggregate to about $14,600, were assigned directly to Owen.

During the time that the automobile sales agencies were conducted as a separate business by Tompkins, when Brooks was acting as trustee, Tompkins became indebted to the Commercial Acceptance Trust Company of Chicago in the sum of about $4,500. French and Nelson gave to Tompkins accommodation notes, which Tompkins assigned to the trust company. To protect French and Nelson upon these accommodation notes, Tompkins executed deeds to Nelson for certain real estate he owned at that time. Tompkins later paid about $1,400 of this indebtedness, and the balance, amounting to about $3,100, was paid, in part, at least, from proceeds derived from the sale of the real estate deeded by Tompkins to Nelson. It also appears from the evidence of French that he paid a part of this indebtedness, but his evidence upon that question is indefinite and uncertain.

After French took possession as assignee of the Brooks trust mortgage, the automobile sales agencies held by Tompkins were merged in the garage business. Nothing was paid to Tompkins for these agencies, although it is admitted by French that the King agency was valuable. French also secured the agency for the sale of Chevrolet automobiles, for which he advanced a thousand dollars of his own money, and this agency was also merged in the

business conducted in the name of the Hermitage Garage & Auto Company. Transactions in these cars were entered in the same books as the transactions in the garage business, and the money arising therefrom kept in the same bank account. Checks were drawn indiscriminately upon this account for the purpose of the garage business and the sales agencies.

In furtherance of the plan to organize a corporation to take over this property and business, advance subscriptions were taken to its capital stock, and advance payments, aggregating $5,500, were made by the subscribers to this stock, which advance payments were to be applied as a credit on their stock subscriptions when the corporation should be organized. This money was placed to the account of the Hermitage Garage & Auto Company and used in the conduct of its business. On August 30, 1920, French submitted to Nelson a proposition in writing that, in consideration of Nelson assigning to him by bill of sale all of Nelson's interest in the business and proposed corporation, French would protect Nelson against any obligation incurred through indorsement or guaranty of accounts, or any other claims that Nelson might have against Tompkins personally, and also that he would accord just treatment to Tompkins in the reorganization plans. Nelson thereupon withdrew from further participation in the organizing of the proposed corporation, but French was never able to procure the release of Nelson upon his indorsements, and Nelson never executed to him any bill of sale for any interest that he might have therein. Tompkins and French proceeded with their efforts to organize a corporation, in which each was to receive a substantial portion of the stock. Later French offered Tompkins $10,000, to be paid from time to time out of the earnings of the proposed corporation, for his interest in all the business and property, instead of stock in the corporation. It does not appear from the evidence that Tompkins accepted this proposition. In any event, the corporation was never formed, and when French was arrested the plan was abandoned. French testified in reference to this, "I hadn't time to complete the deal with him before my arrest."

From time to time during September and October of that year about $27,000 was borrowed from the Guarantee Bond & Mortgage Company for the purchase of new automobiles for resale at retail. Bills of sales covering the automobiles purchased with the borrowed money were executed and delivered to the Guarantee Bond & Mortgage Company by "Fred W. French and Claude B. Tompkins, doing business as the Hermitage Garage & Auto Company of the City of Grand Rapids, etc.," and signed "Hermitage Garage & Auto Company, by Claude B. Tompkins and Fred W. French." Some of the notes were signed "Hermitage Garage & Auto Company, Claude B. Tompkins," and indorsed on the back "Claude B. Tompkins, Fred W. French." Others were signed "Hermitage Garage & Auto Company, Fred W. French, Claude B. Tompkins," and indorsed on the back "F. W. French, C. B. Tompkins." All of these bills of sale were recorded in the office of the city clerk for the city of Grand Rapids, Kent county, Mich.

Money was also borrowed from the Chattel Loan Company, and bills of sale given to that company, covering the automobiles purchased with the money borrowed from it. These bills of sale stated on their face that French was the trustee of the Hermitage Garage & Auto Company. One of these bills of sale was signed "Hermitage Garage & Auto Company, by F. W. French." The other was signed "Hermitage Garage & Auto Company by F. W. French, Trustee." On September 13, 1920, Tompkins assigned to French the lease of the building in which this business was conducted.

On November 27, 1920, French was arrested upon the charge of embezzlement of funds of the bank in which he was employed. Two or three days after the arrest of French, Brooks, the original trustee, took possession of the property and employed Nelson as his agent to take charge of the same. On December 9, 1920, an involuntary petition in bankruptcy was filed against French. On the 20th of that month French was adjudged a bankrupt, and Charles V. Hilding was elected trustee. On February 12, 1921, Hilding pasted a notice on several of these automobiles claiming ownership as trustee in bankruptcy of the property of French. On February 16, 1921, the Guarantee Bond & Mortgage Company filed a bill of complaint in the circuit court of

Kent county, in chancery, against Tompkins and French, as partners, to enforce its liens upon these automobiles for the money loaned by it to Tompkins and French for their purchase.

On March 7, 1921, Hilding, trustee in bankruptcy of the estate of French, filed a bill in the United States District Court, alleging that all of the automobiles covered by these bills of sale and all of the property covered by the trust mortgage were owned by French individually, and therefore a part of the bankrupt estate. He procured a restraining order preventing the Guarantee Bond & Mortgage Company from proceeding in the suit filed in the state court. Later a decree was entered in the District Court, ordering and directing that all of this property should be delivered to the trustee and administered by him as assets of the bankrupt's estate; the priorities, if any, to be determined in the proceeding in bankruptcy. Nelson was ordered to account for all of the property covered by the trust mortgage. From this decree the Guarantee Bond & Mortgage Company, Chattel Loan Company, and Walter J. Nelson have appealed.

The defendants Claude B. Tompkins and the Hermitage Realty Company did not join in the appeal, nor does it appear that either of these defendants declined to do so after opportunity given. It further appearing that they have or claim interests which were or might be affected by the decree below, and by reversal or modification of the same upon appeal, it was therefore ordered by this court that appellants cause to be issued and served forthwith an amended citation, to be signed by a judge of this court, making the Hermitage Realty Company and Claude B. Tompkins respondents thereto, and that within 10 days after such service the Hermitage Realty Company and Claude B. Tompkins, if they or either of them desire to be heard in this court upon this appeal, file with the clerk a request for such hearing.

This amended citation was issued in pursuance of said order, on the 13th day of April, 1923, and served on Claude B. Tompkins and the Hermitage Realty Company more than 10 days have elapsed since the service of such amended citation, and neither Claude B. Tompkins nor the Hermitage Realty Company has made any application to be heard upon such appeal.

J. T. McAllister, of Grand Rapids, Mich. (M. Thomas Ward and J. T. and T. F. McAllister, all of Grand Rapids, Mich., on the brief), for appellants.

Glenwood C. Fuller, of Grand Rapids, Mich. (Wicks, Fuller & Starr, of Grand Rapids, Mich., on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). [1] Upon the questions material to the disposition of this case, there is substantially no conflict in the evidence. It is clear that French never was the owner, and never claimed or represented himself to be the owner, of the property covered by the trust mortgage to Brooks. Brooks held this property in trust for the benefit of the creditors of Tompkins, and French succeeded Brooks as trustee of this express trust. The property was at all times the property of Tompkins, subject to the payment of the debts secured by the trust mortgage. These debts were never paid and canceled, nor was the mortgage ever released. It is still in full force and effect as security for the payment of these claims. If, before or after the assignment of this trust mortgage to French, he became the owner by purchase or otherwise of part of the debts secured thereby, or for any reason he is entitled to be subrogated to the rights of any of the creditors, his beneficial interest in the trust does not change his trust relation to the property or business.

French did not claim to be in possession of this property as owner, but as trustee. Upon this proposition he testified as follows:

"I supposed that I simply acted for Walter Brooks pending the organization of my corporation. * * * I took possession of the Hermitage property, as I supposed, acting as trustee for Walter Brooks, and so told them down there at the time. * * * I was successor to Walter Brooks, trustee. I operated the business as his successor until the time of my arrest."

It is equally clear that French was not the owner of the new automobiles described in the bills of sale to the Guarantee Bond & Mortgage Company and the Chattel Loan Company, either at the time the petition in bankruptcy was filed or at the time he was adjudged a bankrupt. When French took possession as trustee, Tompkins turned over to his control the agencies for the sale of the King and Liberty automobiles, which he had been conducting as a separate and distinct enterprise from the Brooks trust. Nothing was paid to Tompkins for these agencies, although French testifies that the King agency was valuable. This agency was merged by French with the trust business conducted by him, and thereafter all transactions in reference to this agency and in reference to the trust property and business were entered in the one set of books that French caused to be opened when he succeeded Brooks as trustee. French procured the agency for the sale of the Chevrolet automobiles, for which he paid $1,000 of his own money, and this was also merged in the trust business, and no separate accounts were kept in relation thereto. The moneys arising from all sources were commingled in one fund and deposited in bank to the credit of the Hermitage Garage & Auto Company.

Tompkins and French did not enter into a contract of partnership, either verbal or written. The failure to make such a contract, or some other contract defining their rights and business relation to each other, is fully explained by the fact that both contemplated an early organization of the proposed corporation to take over the trust property and business and the automobile sales agencies as a unit. They evidently relied for the protection of their respective rights upon their arrangement in reference to a division of the stock in that corporation. In the absence of such a contract, pending the organization of the proposed corporation, their legal relation to each other and to this property and business must be determined by the law applicable to the facts admitted or proven in this case.

Notwithstanding they had merged these sales agencies with the trust property and business of the Brooks trust, they represented themselves as partners, not only directly to those dealing with them, but by bills of sale of public record in the city and county in which they were transacting this business. For the purpose of obtaining large sums of money from the Guarantee Bond & Mortgage Company, they signed bills of sale reciting that Fred W. French and Claude B. Tompkins were doing business as the Hermitage Garage & Auto Company, and signed and caused these bills to be signed "Hermitage Garage & Auto Company, C. B. Tompkins and F. W. French," and in some cases by C. B. Tompkins only. Upon this state of the proof, French cannot now be heard as against the Guarantee Bond & Mortgage Company to deny the truth of these statements and representations upon which he secured the

larger portion of the money with which to purchase the same automobiles now in dispute.

It is true that French testified that he made no such initial representation to the Guarantee Bond & Mortgage Company, but that company, believing that Tompkins was jointly interested in the property and business, insisted upon Tompkins signing these notes and bills of sale. That, however, is wholly unimportant. When French signed these bills of sale, containing these recitals, he admitted the truth of the statements therein written.

French is also estopped to deny that he was acting in his capacity of trustee for the Hermitage Garage & Auto Company in procuring the loans from the Chattel Loan Company. He was then in possession of the property and operating the business of the Hermitage Garage & Auto Company as trustee. Not only had the automobile sales agencies actually been merged with his trust, but French expressly represented in and by these bills of sale that he was borrowing this money for the purposes of his trust and not in his personal capacity. The Chattel Loan Company, with knowledge that he was in fact the trustee of the Hermitage Garage & Auto Company, had a right to rely upon his representations that the money it loaned him was to be used for the purposes of the trust. He cannot now claim as against the Chattel Loan Company that these automobiles are his personal property.

[2] If French is estopped to deny the existence of a partnership as against the Guarantee Mortgage and Trust Company and estopped to deny, as against the Chattel Loan Company, that he was acting in a trust capacity, his trustee in bankruptcy is also estopped. The trustee succeeds to no higher rights in the bankrupt estate than the bankrupt possessed, except in so far as the statute authorizes him as such trustee to recover property transferred or assigned in fraud of creditors.

Wholly aside from the question of estoppel, it clearly appears from the uncontradicted evidence .that French was in fact trustee of the agencies for the sale of King and Chevrolet automobiles, which agencies had been merged and consolidated by himself and Tompkins with the garage property and business included in the trust mortgage. In reference to this French testified in substance that he was at all times acting as trustee; that there were three distinct conditions created that were interwoven and dependent upon each other; that he was trustee for "two different bunches of men"—Mr. Nelson and Mr. Tompkins, on the one hand, and the men who had contributed $5,500 as advance payment upon their subscription to the capital stock of the proposed corporation, which money had been placed in the common fund of the Hermitage Garage & Auto Company and used largely in the payment of the purchase price of cars for resale at retail. It is true that French also testified that "the Brooks trust was not mixed up with the other trusts;" but it clearly appears from his further testimony that he was mistaken about this and that this Brooks trust was one of the three conditions to which he referred "as interwoven and dependent upon each other." He also testified that "the business was merged in such a shape that there was no way of separating profits;" that checks were drawn upon the common fund in payment of the purchase price of new cars; that these checks were taken care of by the money borrowed and

money put in by men who were going into the new corporation and from the funds of the garage itself.

It further appears, from the testimony of the bookkeeper, that there was but one set of books in which all transactions were entered; that the funds were all commingled in one account and that the new cars were purchased partly with the money borrowed and partly with the money paid in by men who were going into the new corporation and partly from money of the Hermitage Garage & Auto Company, received by it for cash sales of automobile parts. It is not controlling that the Brooks mortgage, and therefore French's title as successor trustee, did not in form cover the new elements of property and business added after French was in substantial control. The parties all treated the existing (Brooks) trusteeship as a convenient agency in which to place temporarily the title to everything which was gathered in for the proposed corporation. "French, Trustee," or "Hermitage Garage & Auto Company," were merely names for this anticipated entity. It is, we think, the inevitable inference that all parties intended the maintenance of the Brooks trust for the benefit of all interested parties, until the corporate plans should be perfected, and whether some of the contributing parties were, as between themselves or as to certain interests, partners in the enterprise or creditors of it, or otherwise interested therein, is not now important. An intent that the legal title to everything should vest in French personally would have been very improbable, and, to say the least, it is not clearly proven.

While French testified that he put about $16,000 into this business, yet it appears by his further testimony that this sum included money borrowed by him and Nelson to purchase claims against Tompkins at 50 cents on the dollar, money he paid upon accommodation paper given by Nelson and himself long prior to the time the trust mortgage was assigned to him to pay Tompkins' debt for King automobiles when Tompkins was operating this agency as a separate and distinct enterprise and $5,000 paid by him upon the lease and option to purchase the property in which the business was transacted, which was paid after that contract was assigned to him. It is true that French did advance $1,000 on the Chevrolet sales agency, and perhaps another $1,000 on the purchase of $2,000 worth of Chevrolet parts, but as against these advancements he was indebted to the business in the sum of $485.03 for gasoline, oil, repair, and parts for his personal use.

The claim that French ever made any advancements to Tompkins or to the business of any sum of money whatever as a capital investment is entirely negatived by the fact that he demanded and procured from Tompkins an assignment of this lease and option contract as security for whatever money he had loaned to Tompkins or expended directly in furtherance of their plan to organize a corporation to take over the property and business. In this connection he testified:

"The progress of incorporating the company was not progressing as fast as I would like to have had it, under the financial conditions at that time, and I felt that I was not properly secured for the amount of money I had in, and when I learned what Mr. Tompkins was trying to do in the way of forming a separate organization—I mean not doing the right thing, was that he was trying to form a separate organization to carry the business himself with some of his friends. I was to be slipped out very quietly, etc., so I put it up to

him to either pay me what I had coming or give me the only thing he could give me to secure me for the money I had put in, which was his equity in this building, that was all there was left."

This lease and option was appraised when French took possession as trustee at $17,100. There was also a pencil memorandum in connection with this item of "$7,500." French testified that he put that pencil memorandum of $7,500 opposite this item on the appraisement sheet because that amount represented the actual amount that had been paid upon it, but that it was in fact worth much more. There is a conflict between the testimony of Tompkins and the testimony of French as to the purposes for which this lease option was assigned to French. French says the assignment to him was absolute and unconditional; that "he simply purchased the equity." If he did, then he must have accepted it in payment of the money he had put into the enterprise. Tompkins testified it was assigned to French as security only for money advanced by French upon the agreement and understanding that when French was repaid he would assign the lease option to the proposed corporation. In support of his verbal testimony Tompkins introduced in evidence a letter signed by himself, dated September 7, 1920. The date of this letter is evidently a mistake, for it refers to the assignment of this lease to French on September 13, 1920. This letter purports to confirm a conversation had between Tompkins and French on the evening before. It specifically provides the amount and kind of stock to be issued by the proposed corporation that a part of it should be sold for promotion purposes and the residue equally divided between Tompkins and French and that the lease option "shall be turned into the new corporation as soon as F. W. French's personal claims for money advanced have been satisfied." French practically admits that he dictated this letter but he can not explain the discrepancy in the date. French also admits that he marked upon a copy of this letter: "O. K. F. W. French."

It is, however, wholly unimportant whether this lease option was assigned to French absolutely in payment of money advanced by him or as security for the repayment of that amount. In either event it fixed his status as a creditor of Tompkins and the Hermitage Garage & Auto Company, and not as owner of any part of the property in his possession as trustee for all the interested parties, including the subscribers to the capital stock of the proposed corporation who advanced $5,500 that went into the common fund. It would seem unnecessary to say that French's trustee in bankruptcy did not succeed to his trust relation to this business and property. If French has any claim not paid and extinguished by the assignment to him of this lease and option, his trustee in bankruptcy has a right to enforce it for the benefit of the creditors of the bankrupt's estate, but he has no right to the possession of property held by French as trustee at the time he was adjudged a bankrupt, nor has he the right to administer that property as a part of the bankrupt estate.

For the reasons stated, the judgment of the District Court is reversed, and cause remanded for further proceedings in conformity with this opinion.